UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WASHINGTON HOMEOWNERSHIP RESOURCE CENTER,<br><br>                    Plaintiff,<br><br>        v.<br><br>DRAGONFLY DEVELOPMENT INC. et al.,<br><br>                    Defendants. | CASE NO. 2:24-cv-00226-LK<br><br>ORDER DENYING MOTION TO DISMISS |

This matter comes before the Court on Defendant Beau Simensen's motion to dismiss for lack of personal jurisdiction. Dkt. No. 17. For the following reasons, the Court denies the motion.

**I.    BACKGROUND**

Plaintiff Washington Homeownership Resource Center ("WHRC") is a Washington-based nonprofit organization whose mission is to increase and preserve homeownership in the State of Washington by educating and empowering current and future homeowners. Dkt. No. 1 at 2–3. WHRC provides resources to homebuyers and homeowners in Washington through a toll-free hotline, an online website, and an online portal. *Id.* at 2. The portal allows Washington

homeowners to receive personalized help and guidance, and also furthers WHRC's "Black Homeownership Initiative." *Id.* at 2, 6; *see also* Dkt. No. 1-1 at 10.

Defendant Dragonfly Development, Inc. ("Dragonfly") is a Delaware corporation with its principal place of business located in Madison, Wisconsin. Dkt. No. 1 at 3.[1] At all relevant times, Mr. Simensen was the owner and president of Dragonfly. Dkt. No. 1-1 at 18; Dkt. No. 20-2 at 2.

Mr. Simensen began working as a contractor for WHRC in October 2020. Dkt. No. 20 at 1. Among his responsibilities was maintaining the online portal. *Id.* In February 2022, WHRC decided to use funds from a grant provided by the Washington State Housing Finance Commission ("WSHFC") to improve the functionality of, and expand the client services offered by, the online portal. *Id.* at 1–2. When Mr. Simensen learned of these plans, he began to solicit WHRC personnel to hire him to lead the development of the new portal. *Id.* at 2; *see also* Dkt. No. 20-1 at 2–3; Dkt. No. 20-3 at 2–4. He represented to WHRC that he was qualified to handle project management and coding for the portal project, and had a team of other individuals that would assist him in completing the project. Dkt. No. 20 at 2; Dkt. No. 20-3 at 2–3; *see also* Dkt. No. 1-1 at 12 (representing the project as a collaboration between "[Dragonfly's] team and WHRC's team").

On June 30, 2022, WHRC and Dragonfly entered an agreement for Dragonfly to develop the new portal. Dkt. No. 20 at 2; Dkt. No. 1 at 12; *see also* Dkt. No. 1-1 at 2–7 (agreement). This agreement incorporated a Scope of Project document, which included a list of "Must Haves" that Dragonfly was required to complete by March 31, 2023. Dkt. No. 20 at 3; Dkt. No. 1 at 2 n.1; Dkt. No. 1-1 at 3, 13, 18, 20–24, 29–37. The Scope of Project document also provided reassurance that "[a]fter 30 days, if [WHRC] decide[s] to stop working on the project with [Dragonfly] for any reason, [WHRC] can let [Dragonfly] know by the beginning of the next period and [Dragonfly]

---

[1] Dragonfly appears to do business as dflydev. *See, e.g.*, Dkt. No. 1-1 at 9, 11–13, 15; Dkt. No. 20-2 at 2.

will return any funds not yet utilized." Dkt. No. 20 at 3; Dkt. No. 1-1 at 18. WHRC proceeded to pay Dragonfly $341,000 from the WSHFC grant in July 2022. Dkt. No. 20 at 3; Dkt. No. 1-1 at 27.

After entering the agreement with WHRC, Mr. Simensen continued to discuss the project with WHRC and its partner organizations via emails, phone calls, and Zoom meetings. Dkt. No. 20 at 3. These discussions included meetings with several of WHRC's Washington-based partners, who met with Mr. Simensen to provide him with the necessary subject matter expertise to build the portal. *Id.*

Despite several deadline extensions, however, Dragonfly ultimately failed to produce any portion of the agreed-upon work. Dkt. No. 1 at 8–11; Dkt. No. 20 at 3. Dragonfly also did not return any of the $341,000 paid to it by WHRC in anticipation of successful completion of the project. Dkt. No. 1 at 11; Dkt. No. 20 at 3. After WHRC demanded a full refund in January 2024, Dragonfly's counsel responded to WHRC that "all funds have already been utilized," and provided WHRC with a document showing nine separate transfers of $37,888 from July 2022 to March 2023 (as well as a tenth transfer of eight dollars in July 2023) from Dragonfly's bank account to Mr. Simensen's personal bank account. Dkt. No. 1 at 4, 11; *see also* Dkt. No. 1-1 at 27.

On February 20, 2024, WHRC initiated this action against Dragonfly and Mr. Simensen. Dkt. No. 1. In its complaint, WHRC asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment against both Defendants, as well as a conversion claim against Mr. Simensen. *Id.* at 12–15.

## II. DISCUSSION

On March 18, 2024, Mr. Simensen filed a motion to dismiss for lack of personal jurisdiction. Dkt. No. 17. Mr. Simensen, who is representing himself pro se, contends that the Court lacks general jurisdiction over him because he is not a Washington resident and was served

at his home in Wisconsin. *Id.* at 1. Mr. Simensen also argues that the Court lacks specific personal jurisdiction over him because (1) "the [c]omplaint fails to show that [he], in [his] individual capacity, purposefully directed sufficient actions towards the State of Washington," and (2) "[t]he allegations against [him] for personal jurisdiction . . . are not sufficient to establish that [he] personally availed [him]self, individually, to the laws of the State of Washington." *Id.* at 1–2.[2]

WHRC counters that Mr. Simensen's motion "is fatally flawed, is based on a retired standard of law, and obfuscates that the entirety of Simensen's relationship with—and the damaging effect on—WHRC and the Washington public establishes clear specific jurisdiction over Simensen." Dkt. No. 19 at 2. Specifically, WHRC maintains that the Court has specific jurisdiction over Mr. Simensen as an individual and as the alter ego of Dragonfly because Mr. Simensen "directed his activities at and consummated a transaction with WHRC, a Washington nonprofit," WHRC brought the litigation "to remedy harms Simensen has wrought on WHRC related to those activities and that transaction," and Mr. Simensen "fails to establish a compelling case that such jurisdiction is unreasonable." *Id.* at 7; *see also id.* at 8–14. Mr. Simensen did not file a reply.

### A.  Subject Matter Jurisdiction

This Court has subject matter jurisdiction over this case because the parties are citizens of different states and the amount in controversy is over $75,000. 28 U.S.C. § 1332(a); Dkt. No. 1 at 3 (WHRC is a citizen of Washington and Defendants are citizens of Wisconsin); *id.* at 12–15 (seeking over $341,000 in damages).

---

[2] Simensen represents that proceedings are stayed against Dragonfly because it has filed a petition for bankruptcy. Dkt. No. 17 at 3. The Court takes judicial notice that Dragonfly filed a petition for bankruptcy on March 15, 2024. *See In re Dragonfly Dev. Inc.*, No. 3-24-10488-rmb, Dkt. No. 1 (Bankr. W.D. Wisc. Mar. 15, 2024) (voluntary petition for Chapter 7 bankruptcy); *see also* 11 U.S.C. § 362(a)(1) (providing for an automatic stay of any judicial "proceeding against the debtor").

B.     Legal Standard

"In opposing a defendant's motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing that jurisdiction is proper." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Id.* Although the plaintiff cannot simply "rest on the bare allegations of its complaint" if an allegation is challenged by the defendant, uncontroverted allegations in the complaint must be taken as true. *Id.* (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)). Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor. *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).

Where there is no applicable federal statute governing personal jurisdiction, a district court applies the personal jurisdiction law of the forum state. *Boschetto v. Hansing*, 539 F.3d at 1015 (9th Cir. 2008). Washington grants courts the maximum jurisdictional reach permitted by due process. *Easter v. Am. W. Fin.*, 381 F.3d 948, 960 (9th Cir. 2004). Thus, the court may exercise jurisdiction over the defendant if it has "certain minimum contacts" with the forum such that exercising personal jurisdiction over it does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). The extent and nature of those contacts can result in general or specific personal jurisdiction over the defendant. *See, e.g.*, *Schwarzenegger*, 374 F.3d at 801–03. Because WHRC concedes that the Court lacks general jurisdiction over Mr. Simensen, Dkt. No. 19 at 6, the Court must determine whether it may exercise specific jurisdiction over him.

The Ninth Circuit uses a three-part test to analyze whether a party's contacts meet the due process standard for specific jurisdiction:

>(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
>(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
>(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802. The plaintiff bears the burden of satisfying the first two prongs to make a *prima facie* showing of specific jurisdiction. *Id.*; *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 859 (9th Cir. 2022). A strong showing on one of the first two prongs will permit a lesser showing on the other. *LNS Enters.*, 22 F.4th at 859. If the plaintiff succeeds in making a *prima facie* showing, the burden shifts to the defendant to present a "compelling case that the exercise of personal jurisdiction would not be reasonable." *Id.* (cleaned up).

C. **Dragonfly Can Be Treated as Mr. Simensen's Alter Ego for the Purposes of Determining Personal Jurisdiction**

WHRC asserts in its complaint that "Dragonfly is, and at all relevant times was, the alter ego of Simensen," Dkt. No. 1 at 3, and relies on this theory in opposing Mr. Simensen's motion to dismiss, Dkt. No. 19 at 4–6, 9. "Under the federal law governing the exercise of *in personam* jurisdiction, if a corporation is the alter ego of an individual defendant, . . . the Court may 'pierce the corporate veil' jurisdictionally and attribute 'contacts' accordingly." *ADO Fin., AG v. McDonnell Douglas Corp.*, 931 F. Supp. 711, 715 (C.D. Cal. 1996) (quoting *Certified Bldg. Prods., Inc. v. NLRB*, 528 F.2d 968, 969 (9th Cir. 1976)); *accord Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015). The relevant inquiry is therefore whether WHRC has plead sufficient facts to establish that Dragonfly is the alter ego of Mr. Simensen for purposes of personal jurisdiction. *Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp. 3d 42, 52 (N.D. Cal. 2020). This, in turn, raises a choice of law issue: "In diversity cases, we look to the choice-of-law rules of the

forum state to determine the veil-piercing law to apply." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 275 n.11 (2d Cir. 2023), *cert. denied sub nom. BASF Metals Ltd. v. KPFF Inv., Inc.*, 144 S. Ct. 681 (2024); *see also Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003) ("[F]ederal courts sitting in diversity apply state substantive law and federal procedural law."). The Court therefore must determine whether to apply the law of Washington, the forum state, or the law of Wisconsin, as set forth in the parties' agreement. Dkt. No. 1-1 at 6 ("All controversies . . . between the parties . . . shall be governed by and construed in accordance with the substantive laws of Wisconsin, but . . . without regard to any conflicts of laws principles[.]").

When analyzing choice of law provisions like the one in the agreement here, federal courts sitting in diversity apply the laws of the forum state. *First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1153 (9th Cir. 2015). Washington's choice-of-law rules require this Court to assess (1) whether there is an actual conflict of laws between the two proposed states, and if so, (2) whether the choice-of-law provision in the relevant agreement is effective. *See, e.g., Gierke v. Allstate Prop. & Cas. Ins. Co.*, No. C19-0071-JLR, 2019 WL 4849494, at *3 (W.D. Wash. Oct. 1, 2019) (citing *Erwin v. Cotter Health Ctrs.*, 167 P.3d 1112, 1120 (Wash. 2007)). Washington courts will enforce a choice-of-law provision unless a three-part test is satisfied: (1) "without the provision, Washington law would apply" under section 188 of the Restatement (Second) of Conflicts of Laws; (2) "the chosen state's law violates a fundamental public policy of Washington"; and (3) "Washington's interest in the determination of the issue materially outweighs the chosen state's interest." *McKee v. AT & T Corp.*, 191 P.3d 845, 851 (Wash. 2008).

There is no conflict between Wisconsin and Washington law regarding the prerequisites to pierce a corporate veil under an alter ego theory. In Washington, "where a private person so dominates and controls a corporation that such corporation is his alter ego, a court is justified in piercing the veil of corporate entity and holding that the corporation and private person are one

and the same." *Pohlman Inv. Co. v. Va. City Gold Mining Co.*, 51 P.2d 363, 368 (Wash. 1935) (quoting *State v. Davies*, 28 P.2d 322, 327 (Wash. 1934)). This occurs "when the corporate entity has been disregarded by the principals themselves so that there is such a unity of ownership and interest that the separateness of the corporation has ceased to exist." *Grayson v. Nordic Constr. Co.*, 599 P.2d 1271, 1273–74 (Wash. 1979) (quoting *Burns v. Norwesco Marine, Inc.*, 535 P.2d 860, 863 (Wash. Ct. App. 1975)). The corporate veil may also be pierced where an individual intentionally uses the corporate form to violate or evade a duty owed to another, as where "the liability-causing activity did not occur only for the benefit of the corporation," or where "the liable corporation has been 'gutted' and left without funds by those controlling it in order to avoid actual or potential liability[.]" *Morgan v. Burks*, 611 P.2d 751, 755 (Wash. 1980). Similarly, in Wisconsin, a court may pierce the corporate veil where (1) an individual "complete[ly] dominat[es]" the finances, policy, and business practice with respect to the subject transaction such that "the corporate entity as to this transaction had at the time no separate mind, will or existence of its own"; (2) the individual uses that control "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights"; and thereby (3) proximately causes injury or unjust loss to the plaintiff. *Consumer's Co-op. of Walworth Cnty. v. Olsen*, 419 N.W.2d 211, 217–18 (Wis. 1988) (cleaned up). "[I]t is a combination of factors which, when taken together with an element of injustice or abuse of corporate privilege, suggest that the corporate entity attacked had 'no separate mind, will or existence of its own' and was therefore the 'mere instrumentality or tool' of the [individual]." *Id.* at 218 (cleaned up). Because there is no conflict between Washington and Wisconsin law on this point and Wisconsin's law does not violate a fundamental public policy of Washington, the Court enforces the Agreement's choice of law provision and applies Wisconsin law to the alter ego analysis.

ORDER DENYING MOTION TO DISMISS - 8

Here, WHRC's allegations satisfy all three factors of Wisconsin's veil-piercing test. First, WHRC alleges that "Simensen has controlled and dominated Dragonfly for his own personal use." Dkt. No. 1 at 4. Specifically, Mr. Simensen "is the sole director and sole officer of Dragonfly," which "has no other employees, officers, or directors," and "Simensen and Dragonfly have the same address and share the same resources, including without limitation, the same telephone services, internet services, and equipment (e.g., computers and other electronics)." *Id.* at 3. Mr. Simensen allegedly "failed to adequately capitalize Dragonfly to meet its corporate needs, pay its creditors, or operate its business when it was formed or during the operations of the business." *Id.* at 4. And WHRC also alleges that Dragonfly's corporate formalities and formal corporate separateness have been ignored because Dragonfly has "failed to file annual reports or maintain adequate corporate records and licenses," resulting in "at least one revocation notice from the Wisconsin Department of Financial Institutions for failing to file or pay for its annual reports" and formal revocation of Dragonfly's "authority to do business in Washington[.]" *Id.* WHRC therefore sufficiently alleges that Mr. Simensen "complete[ly] dominate[ed]" the finances, policy, and business practice of Dragonfly. *Olsen*, 419 N.W.2d at 217; *see also Pohlman Inv. Co*, 51 P.2d at 368; *Grayson*, 599 P.2d at 1273–74.

Second, WHRC alleges that Mr. Simensen "used Dragonfly to induce WHRC to give Dragonfly $341,000," which he then siphoned to his own bank account rather than using the funds to perform the Agreement. Dkt. No. 1 at 4. In particular, Mr. Simensen "revived the previously defunct" Dragonfly "specifically to perform the Agreement for WHRC[.]" *Id.* Dragonfly allegedly had no other clients; its 2022 annual report reflected revenue from only WHRC, and the sole deposit made to its bank account was from WHRC. *Id.* But instead of fulfilling Dragonfly's obligations to WHRC, Mr. Simensen drained the revenue from Dragonfly's bank account by executing nine monthly draws of $37,888.00 to his personal bank account and then used the funds

ORDER DENYING MOTION TO DISMISS - 9

for personal expenditures. *Id.* at 4, 11. Based on these facts, WHRC adequately claims that Mr. Simensen used his control of Dragonfly "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights." *Olsen*, 419 N.W.2d at 218; *see also Morgan*, 611 P.2d at 755.

And third, WHRC contends that due to Mr. Simensen's unlawful actions, it not only lost $341,000 in state grant funds but also "is now years behind schedule, has no deliverables from Dragonfly, and has no funds to hire vendors to build the Project that WHRC paid Dragonfly to complete." Dkt. No. 1 at 4, 11. WHRC stresses that "[d]isregarding Dragonfly's corporate form is necessary and required to prevent unjustified financial loss to WHRC, their Washington clients, and the State of Washington as a whole." *Id.* at 5. WHRC's allegations therefore satisfy the third factor of the veil-piercing test, i.e., that Mr. Simensen's abuse of his corporate privilege as President of Dragonfly proximately caused WHRC's injuries and unjust loss. *Olsen*, 419 N.W.2d at 218.

Mr. Simensen does not challenge these allegations in his motion to dismiss. *See generally* Dkt. No. 17. The Court therefore accepts these uncontroverted allegations as true. *Mavrix Photo*, 647 F.3d at 1223; *Hawes v. Kabani & Co., Inc.*, 182 F. Supp. 3d 1134, 1138 (W.D. Wash. 2016). The allegations support that Dragonfly and Mr. Simensen are effectively one-and-the-same: Dragonfly is a "mere instrumentality or tool" for Mr. Simensen. *Olsen*, 419 N.W.2d at 218 (citation omitted); *see also Morgan*, 611 P.2d at 755. Failure to treat them as such—particularly because Dragonfly has filed for bankruptcy—would unfairly insulate Mr. Simensen from the jurisdiction of this Court. The Court therefore concludes that Dragonfly can be treated as the alter ego of Mr. Simensen for the purposes of determining personal jurisdiction.[3]

---

[3] Because there is no conflict between Wisconsin and Washington law, the Court would reach the same conclusion under Washington law.

ORDER DENYING MOTION TO DISMISS - 10

**D.      The Court Has Specific Jurisdiction Over Mr. Simensen**

For the reasons laid out below, the Court finds that Mr. Simensen's intentional and continuing contacts with Washington establish personal jurisdiction over him with respect to the causes of action in WHRC's complaint.

1. <u>Mr. Simensen purposefully directed his acts at Washington State and purposefully availed himself of Washington's laws</u>

The first prong of the specific jurisdiction test evaluates "whether defendants have voluntarily derived some benefit from their interstate activities such that they will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023) (quoting *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020)), *cert. denied*, 144 S. Ct. 826 (2024). This prong "may be satisfied by purposeful availment, by purposeful direction, or by some combination thereof." *Id.* (cleaned up); *see also Schwarzenegger*, 374 F.3d at 803. Where, as here, a defendant's conduct primarily occurs outside the forum state, courts generally apply the purposeful direction test to evaluate whether the defendant "expressly aimed acts at the forum state knowing that they would harm the plaintiff there." *Impossible Foods v. Impossible X LLC*, 80 F.4th 1079, 1088 (9th Cir. 2023). The purposeful availment test may also be relevant if the defendant "has taken deliberate action within the forum state or . . . has created continuing obligations to forum residents." *Id.* (quoting *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995)). "Purposeful availment generally provides a more useful frame of analysis for claims sounding in contract, while purposeful direction is often the better approach for analyzing claims in tort," but courts "do not impose a rigid dividing line between these two types of claims" and "both tests are relevant" when both types of claims are at issue. *Glob. Commodities*, 972 F.3d at 1107.

Mr. Simensen does not address either test specifically, but rather avers that the Court does not have jurisdiction over him because all of his actions related to his agreement with WHRC occurred in Wisconsin. Dkt. No. 17 at 2. Specifically, he attests that he was in Wisconsin for all of his negotiations and conversations with WHRC and its partner organizations, all of the labor that he performed in relation to his agreement WHRC occurred in Wisconsin with few exceptions, his bank accounts were based in Wisconsin, the money he spent "from [him]" came from Wisconsin, and he chose Wisconsin to be the headquarters for Dragonfly. *Id.* Therefore, Mr. Simensen maintains, "it cannot be said that [he] availed [him]self to the laws and benefits of the State of Washington." *Id.*

Mr. Simensen misunderstands specific jurisdiction. Even if everything he contends were true, it does not immunize him from this Court's exercise of specific jurisdiction because his actions were *directed* at Washington and he otherwise availed himself of Washington's laws. *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 382 (9th Cir. 1990) ("[T]he physical absence of the defendant and the transaction from the forum cannot defeat the exercise of personal jurisdiction."), *rev'd on other grounds*, 499 U.S. 585 (1991); *accord Davis*, 71 F.4th at 1163.

As WHRC correctly points out, the uncontroverted allegations here show that the totality of Mr. Simensen's dealings with WHRC were directed towards Washington. Mr. Simensen does not challenge WHRC's assertion that he "understood that the product Dragonfly and [he] were hired to build would exclusively benefit Washington residents," Dkt. No. 1 at 5, and that he "was well aware of the organization's purpose serving Washingtonians who owned, or hoped to someday own, a home," Dkt. No. 20 at 3; *see also* Dkt. No. 19 at 9. He does not challenge WHRC's assertions that he—as Dragonfly's alter ego—failed to perform its material obligations under the agreement, that he knew the funding for the project would be from public funds, and that he nonetheless "withdrew all of the funds for his personal use and drained Dragonfly of its remaining

assets." Dkt. No. 1 at 2, 11; Dkt. No. 1-1 at 18, 27; Dkt. No. 20 at 1–3. Instead, Mr. Simensen tries to minimize these contacts, emphasizing that WHRC "concedes" that he never built the promised portal and therefore did not direct his actions to Washington. Dkt. No. 17 at 2. But Mr. Simensen's breach means exactly the opposite: he (1) committed an intentional act (promising delivery of a new portal and then breaking that promise), (2) expressly aimed at Washington, (3) causing harm that he knew would be suffered in Washington. His actions therefore satisfy the purposeful direction test. *Davis*, 71 F.4th at 1162–63 (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006)); *see also id.* at 1163 ("An action may be directed at a forum state even if it occurred elsewhere.").

Similarly, the uncontroverted allegations show that Mr. Simensen, both individually and as an alter ego of Dragonfly, personally availed himself of Washington's laws through his dealings with WHRC. To determine purposeful availment, courts "look at a defendant's 'entire course of dealing' with the forum state" to see whether it "establishes a 'quid pro quo'—where the defendant 'purposefully avails [him]self of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws,' and in return 'submit[s] to the burdens of litigation' in the State." *Davis*, 71 F.4th at 1162 (first quoting *Glob. Commodities*, 972 F.3d at 1108, then quoting *Schwarzenegger*, 374 F.3d at 802). Although a contract with a forum resident is insufficient to establish personal jurisdiction on its own, *Burger King*, 471 U.S. at 468, "[p]urposeful availment can be established by a contract's negotiations, its terms, its contemplated future consequences, and the parties' actual course of dealing," *Davis*, 71 F.4th at 1163. Here, Mr. Simensen does not challenge WHRC's assertions that he solicited WHRC to build the portal, including sending WHRC his resume and list of qualifications and changing his project proposal after WHRC expressed concerns about his abilities to handle the project responsibilities. Dkt. No. 1 at 2; Dkt. No. 20 at 2; Dkt. No. 20-1 at 2–3; Dkt. No. 20-2 at 2–3; Dkt. No. 20-3 at 2–4; *see also*

ORDER DENYING MOTION TO DISMISS - 13

Dkt. No. 19 at 9. Having worked with WHRC for over a year before he made this solicitation, Mr. Simensen knew that it was a nonprofit based in Washington that provided services for Washington residents, and that the portal was intended to serve Washington residents. And after executing the agreement, Mr. Simensen continued to discuss the project with WHRC and its Washington-based partner organizations via emails, phone calls, and Zoom meetings. Dkt. No. 20 at 3. A defendant avails himself of the laws and benefits of another state if he "deliberately reache[s] out beyond [his] home—by, for example, exploiting a market in the forum State or entering a contractual relationship centered there." *Davis*, 71 F.4th at 1163 (quoting *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 503 (9th Cir. 2023)). Mr. Simensen also does not challenge WHRC's assertion that he knew that the funding for the project would be from the WSHFC grant and that he anticipated receiving payment from these funds pursuant to the agreement. Dkt. No. 1 at 2; Dkt. No. 1-1 at 18; Dkt. No. 20 at 1–2; *see also* Dkt. No. 1-1 at 27.

The Court therefore finds that the first prong of the specific jurisdiction test is satisfied.

2. <u>WHRC's claims arise out of or relate to Mr. Simensen's Washington-related activities</u>

Under the second prong of the specific jurisdiction test, WHRC must show that its claims against Mr. Simensen "arise out of or relate to" his contacts with Washington. *Impossible Foods*, 80 F.4th at 1091. This means that "a direct nexus" must "exist[] between [Mr. Simensen's] contacts [with Washington] and the cause of action." *Yamashita*, 62 F.4th at 504 (quoting *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 742 (9th Cir. 2013).

WHRC states that its claims against Mr. Simensen would not exist "but for [his] direct solicitation for work as WHRC's [p]ortal developer." Dkt. No. 19 at 12. Specifically, "WHRC would have had no cause of action to bring against Simensen" had he not solicited WHRC for the role, induced WHRC to hire him, entered into an agreement with the Washington-based company,

taken $341,000 of Washington state funds, breached the Agreement with WHRC, and harmed Washington residents as a result. *Id.*

The Court agrees that all of WHRC's claims arise out of Mr. Simensen's contacts with Washington. Therefore, the second prong of the specific jurisdiction test is satisfied.

    3. <u>Specific jurisdiction over Mr. Simensen is reasonable</u>

Because WHRC has satisfied the first and second prongs of the specific jurisdiction test, Mr. Simensen shoulders the burden of "present[ing] a compelling case that the exercise of jurisdiction would not be reasonable." *Axiom Foods*, 874 F.3d at 1068–69. Courts in the Ninth Circuit weigh a number of factors to determine the reasonableness of exercising specific jurisdiction, including:

> (1) the extent of the defendant's purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of the conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1079 (9th Cir. 2011) (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002) (internal quotation marks omitted)).

Mr. Simensen makes no argument as to reasonableness in his motion to dismiss, *see generally* Dkt. No. 17, and did not file a reply to WHRC's opposition. He therefore has not met his burden to demonstrate that exercise of jurisdiction would not be reasonable.

### III. CONCLUSION

For the foregoing reasons, Mr. Simensen's motion to dismiss, Dkt. No. 17, is DENIED.

Dated this 24th day of July, 2024.

*Lauren King*
Lauren King
United States District Judge

ORDER DENYING MOTION TO DISMISS - 15